# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Curtis C. Nelson,

          Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

---

Crown Bank,

          Plaintiff,

v.

Curtis C. Nelson,

          Defendant.

Adv. No._____

---

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF A PARTICULAR DEBT UNDER 11 U.S.C. § 523(a)(2)

Plaintiff, Crown Bank, as and for its complaint against the Defendant, states and alleges as follows:

### INTRODUCTION

Curtis C. Nelson defaulted on his obligations to make payments on three loans extended by Crown Bank with an outstanding balance totaling more than $3,130,000.00 in principal. In addition, Nelson defaulted on his agreement to absolutely and unconditionally guarantee payment of $1,000,000.00 on a $2,000,000.00 loan to a related third party in which he was a principal. In its State Court litigation related to Nelson's breaches of his agreements with Crown Bank, Crown Bank discovered that: (i) Nelson falsely stated his assets and liabilities at the time he entered into the loans with Crown Bank (ii) and again falsely stated his assets and liabilities in

order to induce Crown Bank to extend the maturity dates of the loans. Nelson further misrepresented to Crown Bank the nature and value of additional collateral he pledged to Crown Bank in order to induce Crown Bank to extend the maturity date of a $3,000,000.00 Loan. In the State Court litigation, the court found that Nelson "committed an intentional fraud" upon Crown Bank.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1334.

2.      This action constitutes a core proceeding under 28 U.S.C. § 157(b).

3.      Venue is proper in this District under 11 U.S.C. § 1409.

## THE PARTIES

4.      Crown Bank is a banking corporation organized under the laws of the State of Minnesota with a principal place of business at 601 Marquette Avenue, Suite 125, Minneapolis, Minnesota 55402.

5.      On information and belief, Defendant Curtis C. Nelson ("Nelson") is a Minnesota resident whose last known residence is 1555 Linner Road, Wayzata, Minnesota 55391.

## FACTUAL ALLEGATIONS

6.      On October 19, 2010, Crown Bank filed a lawsuit against Nelson in Minnesota District Court, Hennepin County, titled Crown Bank vs. Curtis C. Nelson, Court File No. 27-CV-10-24189 ("State Court Action") alleging breach of contract and declaratory judgment in order to liquidate collateral. On December 14, 2010, pursuant to a stipulation of the parties, Crown Bank filed an amended complaint adding allegations of fraud and intentional misrepresentation.

**A.** **Nelson Misrepresents his Assets and Liabilities to Induce Crown Bank to Extend Him a $3,000,000.00 Loan**

7.      In early July 2008, Nelson approached Crown Bank seeking a $3,000,000.00 loan ($3,000,000.00 Loan) for certain business investments.

8.      On or around July 28, 2008, Nelson provided Crown Bank with a verified personal financial statement in connection with his request for the $3,000,000.00 Loan (the "July 28, 2008 Personal Financial Statement"). As part of his July 28, 2008 Personal Financial Statement, Nelson represented the following as his assets and liabilities:

   a.      His two residences valued at $6,936,400;

   b.      Total liabilities of $9,720,109.44; and

   c.      His net worth of $18,570,215.06.

In his verified July 28, 2008 Personal Financial Statement, Nelson stated that the appraisal of his residences was conservative, that he would be obtaining another appraisal, and that he would forward the new appraisal to Crown Bank. A true and correct copy of the July 28, 2008 Personal Financial Statement is attached as <u>Exhibit 1</u>.

9.      On or about August 28, 2008, Crown Bank entered into a Promissory Note for Loan Number 4082129 in the amount of $3,000,000.00 with Nelson. Crown Bank's decision to loan Nelson $3,000,000.00 was based on Nelson's verified July 28, 2008 Personal Financial Statement, which purported to represent his assets and liabilities. Crown Bank relied on Nelson's verified July 28, 2008 Personal Financial Statement stating that his net worth was in excess of $18,000,000.00 when extending the $3,000,000.00 Loan to Nelson.

10.      The $3,000,000.00 Loan was evidenced by a loan agreement ("Loan Agreement"), attached hereto as <u>Exhibit 2</u>.

11.     Pursuant to the terms of Loan Agreement, Nelson was "required to maintain a minimum liquidity of $3,000,000.00 tested monthly" and was required to submit to Crown Bank a brokerage statement on a monthly basis and a personal financial statement and tax return on an annual basis.

12.     As security for the $3,000,000.00 Loan, Nelson executed a Security Agreement dated August 28, 2008, wherein he pledged to Crown Bank the assignment of "business investments to be delivered to the Bank from time to time," including 2,542,373 units of Visible Customer Holdings, LLC stock.   A true and correct copy of the Security Agreement dated August 28, 2008 and the Collateral Receipt for the Stock received on August 28, 2008 is attached hereto as Exhibit 3.

13.     The original maturity date of the $3,000,000.00 Loan was August 28, 2009.

14.     In August 2009, when the $3,000,000.00 Loan matured, Crown Bank agreed to extend the loan's maturity date to February 28, 2010.

**B.      Nelson's Misrepresents the Nature and Value of Collateral Provided to Crown Bank to Induce Crown Bank to Extend the $3,000,000.00 Loan's Maturity Date**

15.     In January 2010, Crown Bank Senior Vice President, John Lindquist, contacted Nelson to inform him that the $3,000,000.00 Loan would mature on February 28, 2010, and that Crown Bank would not agree to extend the maturity date of the loan unless Nelson provided additional security for repayment of the loan and a current liquidity statement which accurately represented Nelson's net worth.  Nelson had not provided a liquidity statement since September 2009, and the September 2009 statement demonstrated that the loan was in violation of the $3,000,000.00 liquidity covenant as his reported liquidity was $2,800,000.00.  From the time Crown Bank originated the $3,000,000.00 Loan, Nelson's liquidity had diminished significantly

and in January 2010 Crown Bank would not extend the loan again unless it obtained additional collateral as security.

16.     In response, on or about January 15, 2010, Nelson told Lindquist that he had a coin collection from his grandfather, Curtis Carlson, that was worth in excess of $2,000,000.00 and that he would pledge his grandfather's coin collection as security for the $3,000,000.00 Loan.  In addition, Nelson provided Crown Bank with a liquidity statement, dated November 2009.  A copy of the November 2009 liquidity statement Nelson provided Crown Bank is attached hereto as Exhibit 4.

17.     On that same date, Nelson provided a letter dated October 8, 2009 stating that a coin valuation company had reviewed the contents of Nelson's coin collection and that "the contents of the collection, if sold, would likely bring a minimum price of $2,000,000."  A copy of the October 8, 2009 letter is attached hereto as Exhibit 5.

18.     Based on Nelson's representations and agreement to pledge the coin collection as collateral, and based on the letter dated October 8, 2009, confirming the value of the coin collection at $2,000,000.00, Crown Bank agreed to extend the maturity date of the $3,000,000.00 Loan to April 28, 2011.  Crown Bank would not have granted this loan extension without sufficient additional collateral.[1]

19.     On March 25, 2010, Lindquist went to Nelson's home to retrieve the coin collection.  Nelson represented to Lindquist that he was providing Crown Bank with the coin collection previously valued by the coin valuation company, and further represented that he had

---

[1]     Crown Bank agreed to a short extension of the maturity date of the $3,000,000 Loan, until April 28, 2010, to finalize the loan documents and secure the additional collateral.

forgotten that certain coins were included in the coin collection which likely increased the value of the coin collection to $3,000,000.00 or $4,000,000.00.

20.     After the coin collection was secured, on March 25, 2010, Nelson executed the Security Agreement, pledging, as security for the $3,000,000.00 Loan, his coin collection contained in 11 (eleven) plastic bins located at Brinks U.S. Offices located at 830 Boone Avenue N., Golden Valley, Minnesota, for the Benefit of Crown Bank subject to Brinks' U.S. Service Agreement by and Between Brinks and Crown Bank Dated March 25, 2010 ("Security Agreement").  Nelson crossed out the liquidity covenant that was previously part of Loan Agreement since Crown Bank agreed to substitute the coin collection in lieu of the liquidity covenant.  A true and correct copy of the Security Agreement dated April 28, 2010 is attached hereto as Exhibit 6 and a true and correct copy of the March 25, 2010 Brinks U.S. Service Agreement is attached hereto as Exhibit 7.

21.     Nelson made the required monthly interest payments under the terms of Loan Agreement until June 28, 2010, but failed to make the required monthly payments thereafter.

22.     On September 3, 2010, Crown Bank demanded Nelson bring all payments, including late charges and accrued interest, current on Loan Agreement.  The September 3, 2010 Demand Letter from Crown Bank is attached hereto as Exhibit 8.

23.     Under the terms of the Security Agreement dated April 28, 2010, Nelson had a reasonable opportunity to liquidate the collateral to repay the $3,000,000.00 Loan, not to exceed 60 days.  Nelson did not exercise his option to liquidate the collateral and did not provide Crown Bank with any prospective buyers.

24.     Pursuant to its rights under the Security Agreement, on October 20, 2010, Crown Bank sent Nelson notice of its intent to liquidate the coin collection identified as collateral in the

Security Agreement. A copy of Crown Bank's Notice of Disposition of Collateral by Private Sale is attached hereto as <u>Exhibit 9</u>. Nelson did not respond to this Notice.

25. In early November, 2010, Crown Bank made arrangements with the coin appraisal company that had initially valued the coin collection to complete a second appraisal and to obtain a bid for purposes of selling the coins to satisfy Nelson's obligations to Crown Bank. Crown Bank was referred to Mark One Numismatics for the second appraisal.

26. On November 9, 2010, Mike Abbott, an expert third-party numismatist from Marc One Numismatics, appraised the coin collection identified in the Security Agreement and determined that the coin collection was actually worth less than $39,500.00. Mr. Abbott reported that the collection contained "junk coins" and that it did not include any gold Kruggerands that had been in the collection at the time coin appraisal company valued the coins and executed the letter estimating the collection's value.

27. Following Mr. Abbott's appraisal, the coin appraisal company that had initially valued the coins confirmed that the coin collection reviewed in 2009 was not the same coin collection that Nelson agreed to pledge to and provide to Crown Bank. The collection reviewed in October 2009 included valuable gold coins called Kruggerands. At the time of the October 2009 appraisal of the collection, one Kruggerand was worth approximately $1,050.00, and the coin appraiser recalled seeing several boxes of gold one ounce coins, that were likely also Kruggerands, in Nelson's coin collection. At the time of the coin appraiser's valuation in October 2009, Nelson told the coin appraiser that his coin collection included several additional boxes of the same type of coins.

28. On or about February 14, 2011, Crown Bank completed a foreclosure sale of the coin collection Nelson had pledged. The coin collection sold for $60,700.00.

**C.    Crown Bank Discovers Nelson's Misrepresentation of His Net Worth**

29.    After learning of Nelson's misrepresentation about the coin collection pledged as collateral, in November 2010, Crown Bank requested an Ownership and Encumbrance report ("O&E Report") regarding Nelson and learned that Nelson's representations regarding his assets and liabilities had been materially misrepresented since the loan's inception.

30.    According to the O&E Report, in particular, the April 15, 2009 Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree from the Family Court Division of Hennepin County Court, Court File Number 27-FA-07-266 (the "Divorce Decree"), Nelson knew that his personal residences were valued at less than half the value he had represented to Crown Bank before the $3,000,000.00 Loan Agreement was executed on August 28, 2008.

31.    The Divorce Decree indicates that Nelson obtained an appraisal of his residences on July 31, 2008, approximately one month before he signed the loan documents with Crown Bank.  At paragraph 22, the Divorce Decree states that Nelson submitted an appraisal showing that the homes were valued at $3,689,000.00 as of July 31, 2008, not $6,936,400.00 as he had represented just three days earlier on his July 28, 2008 Personal Financial Statement.  Nelson had a duty to provide notice of this material change in value to Crown Bank before the loan documents were signed, but he never did.  He never provided the updated appraisal to Crown Bank and he continued to misrepresent the value of his personal residences in 2009 and 2010.

32.    In addition, the Divorce Decree identified significant debt Nelson owed to his parents, including a loan in the amount of $8,649,656 payable to the Glen Nelson revocable trust, as of February 8, 2007; Carlson Real Estate Company note in the amount of $1,505,964 and a note payable to Arlene Carlson; additional notes payable to Glen Nelson in the amount of

$101,040 and $103,853; and a debt payable to his mother, Marilyn Nelson, in the amount of $111,886.

33.     In addition to the July 28, 2008 Personal Financial Statement, Nelson provided two subsequent personal financial statements that represented different information about his assets and liabilities than was provided in Nelson's Divorce Decree.

34.     On or around March 11, 2009, prior to Crown Bank's agreement to extend the maturity date of the $3,000,000.00 Loan, Nelson provided Crown Bank with a verified personal financial statement dated December 31, 2008, verified on March 11, 2009 (the "March 11, 2009 Personal Financial Statement").  Nelson represented the following as his assets and liabilities:

      a.      His two residences at $6,952,277.09 and $989,577.13;

      b.      Total liabilities of $10,336,011.44; and

      c.      His net worth of $11,721,262.16.

A true and correct copy of the March 11, 2009 Personal Financial Statement is attached hereto as Exhibit 10.

35.     On or around January 20, 2010, prior to Crown Bank's agreement to extend the maturity date of the $3,000,000.00 Loan, Nelson provided Crown Bank with a verified personal financial statement.  In his verified personal financial statement dated June 2009, verified on January 20, 2010 (the "January 20, 2010 Personal Financial Statement"), Nelson represented the following as his assets and liabilities:

      a.      His two residences at $6,952,277.09 and $989,577.13;

      b.      Total liabilities of $7,414,865.15; and

      c.      His net worth of $16,135,818.91.

A true and correct copy of the January 20, 2010 Personal Financial Statement is attached hereto as Exhibit 11.

36.     None of the debts to Nelson's family were identified to Crown Bank when Nelson verified his personal financial statement at the time Crown Bank agreed to loan Nelson $3,000,000.00 or at the time Crown Bank agreed to extend the maturity of the $3,000,000.00 Loan, despite the fact that Nelson's signature acknowledged his duty to provide "true, correct and complete" information to the bank.  See Exhibits 1, Exhibit 10, & Exhibit 11.

37.     As evidenced by the other debts and liabilities identified in the Divorce Decree, Nelson substantially inflated his net worth to Crown Bank in order to improperly induce Crown Bank to loan him $3,000,000.00, and to extend the maturity of his obligations to the bank.

38.     If Crown Bank had known the information reported in the Divorce Decree on August 28, 2008, Crown Bank would not have agreed to loan Nelson $3,000,000.00, or would have required sufficient additional collateral to secure the loan.

39.     If Crown Bank had known the information reported in the Divorce Decree on March 25, 2010, Crown Bank would not have agreed to extend the maturity date of the $3,000,000 Loan.

**D.     Nelson Discloses Multiple Promissory Notes Identifying Significant Debt**

40.     On June 1, 2011, Crown Bank served Nelson with a subpoena requesting Nelson produce documents pursuant to Fed. R. Bankr. P. 2004(c).

41.     In response to Crown Bank's subpoena, on June 15, 2011, Nelson produced several Promissory Notes he executed identifying significant debts to Glen D. Nelson, Marilyn C. Nelson, the Revocable Trust of Glen D. Nelson, the Revocable Trust of Marilyn C. Nelson, and Diana Nelson, including:

a. a Promissory Note executed by Curtis C. Nelson payable to Marilyn C. Nelson in the amount of $105,966.00, entered into on May 20, 1994, and amended on April 30, 1997, April 1, 2000, and April 1, 2003. A true and correct copy of the Promissory Notes in the amount of $105,966.00, produced by Nelson, payable to Marilyn C. Nelson, with amendments are attached hereto as Exhibit 12;

b. a Promissory Note executed by Curtis C. Nelson payable to Glen D. Nelson in the amount of $94,345.43, entered into on January 31, 1996, and amended on January 31, 2002, and January 31, 2005. A true and correct copy of the Promissory Notes in the amount of $94,345.43, produced by Nelson, payable to Glen D. Nelson, with amendments are attached as Exhibit 13;

c. a Promissory Note executed by Curtis C. Nelson payable to Glen D. Nelson in the amount of $96,852.54, entered into on March 31, 1996, and amended on March 31, 1999, March 31, 2002 and March 31, 2005. A true and correct copy of the Promissory Notes in the amount of $96,852.54, produced by Nelson, payable to Glen D. Nelson, with amendments, are attached as Exhibit 14;

d. a Promissory Note executed by Curtis C. Nelson payable to Marilyn C. Nelson in the amount of $310,000.00 entered into on December 8, 2008. A true and correct copy of the $310,000.00 Promissory Note produced by Nelson, payable to Marilyn C. Nelson, is attached as Exhibit 15;

e.       a Promissory Note executed by Curtis C. Nelson payable to the Revocable Trust of Glen D. Nelson in the amount of $6,200,345.82 entered into on April 30, 2001, renewed on May 31, 2008 as two notes in the amounts of $4,363,064.74 each, and amended on May 31, 2009 as two notes in the amounts of $4,434,504.38 each. True and correct copies of the Promissory Notes produced by Nelson, payable to the Revocable Trust of Glen D. Nelson and the Revocable Trust of Marilyn C. Nelson, are attached as Exhibit 16;

f.       a Promissory Note executed by Curtis C. Nelson payable to Glen D. Nelson in the amount of $500,000.00 entered into on November 18, 2008, and amended on March 31, 2009 in the amount of $509,236.11 and December 31, 2009 in the amount of $528,756.83. A true and correct copy of the Promissory Notes produced by Nelson, payable to Glen D. Nelson, with amendments are attached as Exhibit 17;

g.       a Promissory Note executed by Curtis C. Nelson payable to Diana Nelson in the amount of $100,000.00 entered into on October 1, 2009, and amended on March 31, 2010 in the amount of $101,764.44. A true and correct copy of the Promissory Notes produced by Nelson, payable to Diana Nelson are attached as Exhibit 18;

h.       a Promissory Note executed by Curtis C. Nelson payable to Glen D. Nelson in the amount of $251,319.36 entered into on January 27, 2010. A true and correct copy of the $251,319.36 Promissory Note produced by Nelson, payable to Glen D. Nelson is attached as Exhibit 19;

       i.      a Promissory Note executed by Curtis C. Nelson payable to Glen D. Nelson in the amount of $251,458.33 entered into on January 31, 2010. A true and correct copy of the $251,458.33 Promissory Note produced by Nelson, payable to Glen D. Nelson is attached as <u>Exhibit 20</u>; and

       j.      a Promissory Note executed by Curtis C. Nelson payable to Marilyn C. Nelson in the amount of $200,000.00 entered into on March 25, 2010. A true and correct copy of the $200,000.00 Promissory Note produced by Nelson, payable to Marilyn C. Nelson is attached as <u>Exhibit 21</u>.

42.     In response to Crown Bank's subpoena, Nelson also produced a summary of the principal and interest accrued on the notes held by Marilyn Nelson, Glen Nelson, the Revocable Trust of Glen D. Nelson, the Revocable Trust of Marilyn C. Nelson, and Diana Nelson. A true and correct copy of the May 13, 2010 Summary of Promissory Notes for Curtis C. Nelson produced by Nelson is attached as <u>Exhibit 22</u>.

43.     Nelson did not disclose the over $11,000,000.00 in debt identified in <u>Exhibit 12</u> through <u>Exhibit 21</u> to Crown Bank when Nelson verified his personal financial statement at the time Crown Bank agreed to loan Nelson $3,000,000.00 or at the time Crown Bank agreed to extend the maturity of the $3,000,000.00 Loan, despite the fact that Nelson's signature acknowledged his duty to provide "true, correct and complete" information to the bank. <u>See Exhibit 1</u>, <u>Exhibit 10</u>, & <u>Exhibit 11</u>.

44.     As evidenced by the other debts and liabilities identified in the Promissory Notes attached as <u>Exhibit 12</u> through <u>Exhibit 21</u>, Nelson substantially inflated his net worth to Crown Bank in order to improperly induce Crown Bank to loan him $3,000,000.00.

45.     If Crown Bank had known the information reported in the Promissory Notes attached as Exhibit 12 through Exhibit 16 on August 28, 2008, Crown Bank would not have agreed to loan Nelson $3,000,000.00, or would have required sufficient additional collateral to secure the loan.

46.     If Crown Bank had known the information reported in the Promissory Notes attached as Exhibit 12 through Exhibit 21 on March 25, 2010, Crown Bank would not have agreed to extend the maturity date of the $3,000,000.00 Loan.

47.     As a result of Nelson's misrepresentations about his assets and liabilities, Crown Bank was damaged.

**E.      Nelson Supplied his Personal Financial Statements to Induce Crown Bank to Extend a $10,000.00 Check Credit Line, $130,000.00 Loan and to Accept his $1,000,000.00 Guaranty of a Loan to a Third Party**

**1. $10,000.00 Check Credit Line**

48.     On or around August 28, 2008, Crown Bank entered into a Crown Credit Consumer Open-Ended Agreement for Account No. 1504703, with Nelson in the amount of $10,000.00, which was an unsecured line of credit on his checking account ("$10,000.00 Check Credit Line").  The Check Credit Line Agreement is attached hereto as Exhibit 23.

49.     Crown Bank relied upon Nelson's verified Personal Financial Statements in extending the $10,000.00 Check Credit Line to Nelson.

50.     Under Section 8(F) of the $10,000.00 Check Credit Line, a Default under any other debt or agreement with Crown Bank constituted a Default under the $10,000.00 Check Credit Line.  After a Default, Crown Bank had the right to accelerate the debt and make all or any part of the amount owing immediately due and payable.

51.     On September 3, 2010, Crown Bank demanded Nelson pay the Check Credit Line, including interest, in full.  See Exhibit 7.  Despite demand, Nelson refused to repay the outstanding principal balance.

52.     As a result of Nelson's misrepresentations about his assets and liabilities in his Personal Financial Statements, Crown Bank was damaged.

### 2.  $130,000.00 Loan

53.     On or around January 20, 2010, Crown Bank entered into a Promissory Note for Loan Number 4100061 in the amount of $130,000.00 ("$130,000.00 Loan") with Nelson which was modified to extend the maturity date from April 20, 2010 to December 20, 2010 by agreement (as amended, "Loan Agreement 4100061").   A true and correct copy of Loan Agreement 4100061 is attached hereto as Exhibit 24.

54.     Crown Bank relied upon Nelson's verified Personal Financial Statements in extending the $130,000.00 Loan to Nelson.

55.     Nelson's failure to make payment in full when due was a Default under Section 9(A) of Loan Agreement 4100061.  Under Section 9(F) it was also a Default if Nelson was in default on any other debt or agreement with Crown Bank. After a Default, Crown Bank had the right to accelerate the debt and make all or any part of the amount owing immediately due and payable.

56.     On September 3, 2010, Crown Bank demanded Nelson to bring all payments, including late charges and accrued interest, current on Loan Agreement 410061, but Nelson failed to respond to Crown Bank's demand.

57.     As a result of Nelson's misrepresentations about his assets and liabilities in his Personal Financial Statements, Crown Bank was damaged.

### 3. Guaranty Agreement

58.     On or around August 12, 2009, Crown Bank entered into a Promissory Note for Loan Number 4061054 with Visible Customer LLC and John F. Stapleton in the amount of $2,000,000.00 ("Visible Customer Loan") which was modified on March 18, 2010 to extend the maturity date to April 12, 2010 and on April 12, 2010 to extend the maturity date to October 12, 2010.  A true and correct copy of the Visible Customer Loan is attached hereto as <u>Exhibit 25</u>.

59.     Nelson agreed to personally guarantee the Visible Customer Loan, up to a maximum of $1,000,000.00 of the principal amount outstanding at default, plus accrued interest, attorneys' fees and collection costs.  The Visible Customer Loan was subsequently reduced to $1,500,000.00 through an asset sale by Crown Bank; however, Nelson's guaranteed obligation remained at $1,000,000.00 of the principal amount.  A true and correct copy of the Guaranty Agreement on the Visible Customer Loan executed by Nelson is attached hereto as <u>Exhibit 26</u>.

60.     Crown Bank relied upon Nelson's verified Personal Financial Statements in accepting Nelson's Guaranty of the Visible Customer Loan.

61.     Visible Customer LLC filed for Chapter 7 bankruptcy on Friday, July 6, 2010, which constituted a Default under the Guaranty Agreement and, as a result, Crown Bank was entitled to enforce the Guaranty Agreement against Nelson and collect $1,000,000.00 of the principal amount due and owing plus accrued interest, attorneys' fees and collection costs, and all other costs, fees and expenses agreed to be paid under all agreements evidencing the Debt and securing the payment of the Debt."

62.     As a result of Nelson's misrepresentations about his assets and liabilities in his Personal Financial Statements, Crown Bank was damaged.

**F.** **Prejudgment Attachment Order and Findings by the District Court**

63. Based upon Nelson's fraud and intentional misrepresentations to Crown Bank, Crown Bank immediately brought a motion for pre-judgment attachment in the State Court Action.

64. On December 28, 2010, a hearing was held on Crown Bank's motion. After hearing oral argument, and based on the submissions of the parties, including Nelson's Opposition and affidavit, and the affidavits submitted by the Crown Bank, Hennepin County District Court Judge Sommerville entered an Order for Pre-Judgment Attachment ("Attachment Order"). A copy of the Attachment Order entered on December 28, 2010, in the State Court Action is attached hereto as Exhibit 27.

65. In the Attachment Order, Judge Sommerville, adopted findings of fact that: (i) Nelson knowingly misstated the value of his residences, his liabilities and net worth in the verified personal financial statements provided to Crown Bank, and (ii) that Nelson knowingly misrepresented the value of his coin collection to Crown Bank. The Attachment Order concluded that the facts presented in the State Court Action established that Nelson had "committed an intentional fraud upon Crown Bank." See Exhibit 27.

66. On January 12, 2011, Nelson stipulated to the entry of the Judgment in favor of Crown Bank in the amount of $3,800,000 in the State Court Action. Crown Bank was in the process of collecting on the judgment when Nelson filed this action.

## COUNT I

### (11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representation, and Actual Fraud)

67. Crown Bank restates and realleges the allegations set forth in paragraphs 1 through 66 above as though fully set forth herein.

68.     Section 523(a)(2)(A) of the Bankruptcy Code provides that a debtor may not be discharged from any debt "for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by…false pretenses, a false representation or actual fraud."

69.     As set forth in the Prejudgment Attachment Order, and in the Exhibits attached to Crown Bank's Complaint, Nelson misrepresented to Crown Bank the value of his two residences in the verified July 28, 2008 Personal Financial Statement, March 11, 2009 Personal Financial Statement, and January 20, 2010 Personal Financial Statement.

70.     Nelson misrepresented to Crown Bank the amount of his liabilities and net worth in the verified July 28, 2008 Personal Financial Statement, March 11, 2009 Personal Financial Statement, and January 20, 2010 Personal Financial Statement.

71.     Nelson misrepresented to Crown Bank the value of the coin collection pledged to Crown Bank.

72.     Nelson fraudulently provided Crown Bank with less valuable coins than the coins he pledged to Crown Bank.

73.     If Crown Bank had known the true value of Nelson's residences, liabilities and net worth, Crown Bank would not have made the $3,000,000.00 Loan to Nelson.

74.     If Crown Bank had known the true value of Nelson's coins that he pledged as security, Crown Bank would not have extended the maturity date for the $3,000,000.00 Loan to Nelson.

75.     Nelson's misrepresentations to Crown Bank were made deliberately and intentionally for the purpose of inducing Crown Bank to make the $3,000,000.00 Loan to Nelson.

76.     Nelson deliberately and intentionally misrepresented the value of his coin collection, and then intentionally provided Crown Bank with different coins than he pledged to Crown Bank, all for the purpose of inducing Crown bank to extend the maturity date of the $3,000,000.00 Loan to Nelson.

77.     In reliance upon Nelson's misrepresentations in his verified personal financial statements, Crown Bank made the $3,000,000.00 Loan to Nelson.

78.     In reliance upon Nelson's misrepresentations about the value of his coin collection and Nelson's fraudulent delivery of the coins he pledged to Crown Bank, Crown Bank extended the maturity date of the $3,000,000.00 Loan to Nelson.

79.     As a result of Crown Bank's reliance on Nelson's misrepresentations and fraudulent actions, Crown Bank has suffered damage in the amount of not less than $3,000,000.00.

80.     By reason of the foregoing, Nelson is liable to Crown Bank in an amount to be determined at trial, which debt constitutes a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A).

## <u>COUNT II</u>

### (11 U.S.C. § 523(a)(2)(B): False Written Financial Statement)

81.     Crown Bank restates and realleges the allegations set forth in paragraphs 1 through 66 above as though fully set forth herein.

82.     Section 523(a)(2)(B) of the Bankruptcy Code provides that a debtor may not be discharged from any debt:

> for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by…use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's … financial condition; (iii) on which the creditor to whom the debtor is liable for such money … or credit reasonably relied; and (iv) that the debtor caused to be made … with intent to deceive.

83.    Nelson gave Crown Bank his verified July 28, 2008 Personal Financial Statement that misstated the value of his residences, his liabilities and his net worth.

84.    Nelson gave Crown Bank his verified March 11, 2009 Personal Financial Statement that misstated the value of his residences, his liabilities and his net worth.

85.    Nelson gave Crown Bank his verified January 20, 2010 Personal Financial Statement that misstated the value of his residences, his liabilities and his net worth.

86.    Nelson submitted a letter to Crown Bank dated October 8, 2009, which misstated the value of Nelson's coin collection.

87.    The verified personal financial statements contained materially false information regarding the value of Nelson's assets, liabilities, and financial condition.

88.    The letter to Crown Bank contained a materially false statement about the value of coins Nelson planned on pledging to Crown Bank.

89.    At the time Nelson prepared the personal financial statements, Nelson knew the true values of his residences, liabilities and net worth, but deliberately and intentionally provided false values to Crown Bank for the purpose of inducing Crown Bank to make the $3,000,000.00 Loan to Nelson and for purposes of inducing Crown Bank to extend the maturity date of the $3,000,000.00 Loan to Nelson.

90.    Nelson deliberately and intentionally provided Crown Bank with a false value for different coins than he pledged to Crown Bank for the purpose of inducing Crown bank to extend the maturity date of the $3,000,000.00 Loan to Nelson.

91.    In reliance upon the written values provided by Nelson in his personal financial statements, Crown Bank made the $3,000,000.00 Loan to Nelson, and extended the maturity date of the $3,000,000.00 Loan to Nelson.

92.     In reliance upon the stated value of the coin collection provided in writing by Nelson to Crown Bank, Crown Bank extended the maturity date of the $3,000,000.00 Loan to Nelson.

93.     As a result of Crown Bank's reliance on the false values regarding Nelson's financial affairs and net worth provided in writing to Crown Bank by Nelson, Crown Bank has suffered damage in the amount of not less than $3,000,000.00.

94.     By reason of the foregoing, Nelson is liable to Crown bank in an amount to be determined at trial, which debt constitutes a nondischargeable debt under 11 U.S.C. § 523(a)(2)(B).

WHEREFORE, Crown Bank respectfully requests as follows:

1.     A judgment against Nelson in an amount to be determined at trial, plus interest;

2.     A declaration that Nelson's debt to Crown bank is excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), and 523(a)(2)(B); and

3.     Such further relief as this Court deems just and proper under the circumstances.


Dated: June 28, 2011                    OPPENHEIMER WOLFF & DONNELLY LLP

                                        By:  ___*/e/ David B. Galle*_____

                                        David B. Galle, (MN #311303)
                                        Christine Lindblad, (MN #277666)
                                        Rebecca G. Sluss (MN #387963)
                                        Michelle Schjodt (MN #0390490)
                                        3300 Plaza VII
                                        45 South Seventh Street
                                        Minneapolis, Minnesota 55402
                                        Telephone: (612) 607-7000
                                        Facsimile:     (612) 607-7100

                                        ATTORNEYS FOR PLAINTIFF CROWN BANK

## VERIFICATION

I, John Lindquist, the Senior Vice President of Crown Bank, declare under penalty of perjury that I have read the foregoing Complaint to Determine Dischargeability of a Particular Debt Under 11 U.S.C. § 523(a)(2) (the "Bankruptcy Complaint"), know the contents of the Bankruptcy Complaint, and that the foregoing Bankruptcy Complaint is true and correct according to the best of my knowledge, information and belief.

Dated: June 28, 2011

_____
John Lindquist

23